(A.R.D. 140)

GEO. S. BUSH & CO., INC. *v.* UNITED STATES

Entry No. 3176, etc.

## Second Division, Appellate Term

(Decided February 13, 1962)

*Lawrence & Tuttle* (*Barnes, Richardson & Colburn* by *Hadley S. King* and *Edward N. Glad* of counsel) for the appellant.

*William H. Orrick, Jr.,* Assistant Attorney General (*Murray Sklaroff,* trial attorney), for the appellee.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

FORD, Judge: This application for review of the decision and judgment of the trial court, which was reported in 45 Cust. Ct. 405, Reap. Dec. 9727, filed under the provisions of title 28, U.S.C., section 2636(a), covers the appeals for reappraisement listed in schedule "A," hereto attached and made a part hereof. The merchandise consists of canned baby clams, imported from Japan. Appraisement was predicated upon the American selling price, as that value is defined in section 402(g) of the Tariff Act of 1930, as amended by section 8 of the Customs Administrative Act of 1938.

It is conceded that American selling price is, in fact, the proper basis of value for these importations, by reason of a Presidential proclamation, so decreeing, dated May 1, 1934, 65 Treas. Dec. 736, T.D. 47031, promulgated after an investigation by the Tariff Commission, conducted pursuant to the provisions of section 336 of the Tariff Act of 1930.

The pertinent portions of the tariff provisions, effective as of the times of these importations, and said proclamation read as follows:

SEC. 336.  EQUALIZATION OF COSTS OF PRODUCTION.

(a)  CHANGE OF CLASSIFICATION OR DUTIES.—In order to put into force and effect the policy of Congress by this Act intended, the commission * * * shall investigate the differences in the costs of production of any domestic article and of any like or similar foreign article.  In the course of the investigation the commission shall hold hearings and give reasonable public notice thereof, and shall afford reasonable opportunity for parties interested to be present, to produce evidence, and to be heard at such hearings.  The commission is authorized to adopt such reasonable procedure and rules and regulations as it deems necessary to execute its functions under this section.  The commission shall report to the President the results of the investigation and its findings with respect to such differences in costs of production.  If the commission finds it shown by the investigation that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic article and the like or similar foreign article when produced in the principal competing country, the commission shall specify in its report such increases or decreases in rates of duty expressly fixed by statute (including any necessary change in classification) as it finds shown by the investigation to be necessary to equalize such differences.

In no case shall the total increase or decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute.

(b)  CHANGE TO AMERICAN SELLING PRICE.—If the commission finds upon any such investigation that such differences can not be equalized by proceeding as hereinbefore provided, it shall so state in its report to the President and shall specify therein such ad valorem rates of duty based upon the American selling price (as defined in section 402(g)) of the domestic article, as it finds shown by the investigation to be necessary to equalize such differences.  In no case shall the total decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute, and no such rate shall be increased.

(c)  PROCLAMATION BY THE PRESIDENT.—The President shall by proclamation approve the rates of duty and changes in classification and in basis of value specified in any report of the commission under this section, if in his judgment such rates of duty and changes are shown by such investigation of the commission to be necessary to equalize such differences in costs of production.

*        *        *        *        *        *        *

SEC. 402.  VALUE [as amended].

*        *        *        *        *        *        *

(g)  AMERICAN SELLING PRICE.—The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale for domestic

consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

[T.D. 47031]:

Whereas under and by virtue of section 336 of title III, part II, of the act of Congress approved June 17, 1930 (46 Stat. 590, 701), entitled "AN ACT To provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, to protect American labor, and for other purposes", the United States Tariff Commission has investigated the differences in costs of production of, and all other facts and conditions enumerated in said section with respect to, clams, packed in air-tight containers, being wholly or in part the growth or product of the United States and of and with respect to like or similar articles wholly or in part the growth or product of the principal competing countries;

*      *      *      *      *      *      *

Now, therefore, I, Franklin D. Roosevelt, President of the United States of America, do hereby approve and proclaim a decrease in the rate of duty expressly fixed in paragraph 721(b) of title I of said act on razor clams (siliqua patula), packed in air-tight containers, from 35 per centum ad valorem to 23 per centum ad valorem; and assessment of the rate of 35 per centum ad valorem expressly fixed in said paragraph, title, and act on clams other than razor clams, and clams in combination with other substances (except clam chowder), packed in air-tight containers, upon the American selling price, as defined in section 402(g) of said act, of clams other than razor clams, and clams in combination with other substances (except clam chowder), packed in air-tight containers, manufactured or produced in the United States.

At the trial of this matter, in addition to two witnesses called on behalf of appellant, plaintiff below, counsel for the respective parties entered into a stipulation to the effect that the imported merchandise was appraised on the basis of the American selling price under section 402(g), *supra*, of a clam, commonly known as a soft-shell clam, the product of New England, which was packed in airtight containers in Portland, Maine. It was also agreed that the cans weighed, with their contents, 10 ounces each, and that said American selling price for this period was $4.75 per dozen cans, less 1½ per centum cash discount, less one-quarter of 1 per centum swell allowance, except for the last entry, which was given only one-tenth of 1 per centum swell allowance. It was further stipulated and agreed that, for the period involved herein, based upon the sales of Iwerson Canning Co. of Bellingham, Wash., the price at which whole little neck clams produced in the United States, packed twenty-four 10-ounce tins per carton, were freely offered for sale was $7.50 per carton, less 1½ per centum cash discount, less one-tenth of 1 per centum swell allowance, such price including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the

merchandise in condition, packed ready for delivery, in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market.

The first witness called on behalf of the importer was Mr. Joseph Lobberegt, president of Fan-Sea Foods, Inc., importer of tunafish, oysters, clams, and smoked fish. The witness testified that he is familiar with the type of clams involved herein; that they are known as little neck clams, which he has dug for in his summer home on Comando Island in this country for a period of over 10 years; that, while he has never been to Japan to observe the canning operations, he could see that the imported clams were identical with those he dug for at Comando Island.

Mr. Albert S. Young, supervising sanitarian of the Seattle King County Health Department, was next called on behalf of the importer. Mr. Young testified that his department is concerned with environmental sanitation of the northern district of Seattle and King County; that he is a graduate of the University of Washington, College of Fisheries, obtaining his degree of bachelor of science in 1929; that, subsequently, during the summer of 1949, he did graduate work at the University of Washington biological laboratory; that, in addition, he has had 4 years of graduate work in zoology at the University of Washington and was employed as a teaching fellow at the university; that these post-graduate courses included marine embryology.

The witness then testified that he worked for the oceanographic laboratory of the University of Washington; that his study of marine embryology included mostly invertebrates, which would include clams; that he was subsequently employed by the State of Washington in the pollution control commission, which was concerned with all the waters of the State of Washington, including salt water as well as fresh water, and surface water as well as underground water; that his job entailed intensive surveys on the effects of pollutants in water; that his work required him to be familiar with and recognize the various types of clams; that he also worked for the United States Bureau of Fisheries for a period of about 6½ years as a statistical marketing agent, covering the New England, South Atlantic, and Gulf States; that, during this period, he became familiar with the type of clams found on the New England coast; that, professionally, he has been familiar with the various species of fish and clams from the Atlantic coast to the Pacific coast for 18 to 20 years.

Mr. Young then testified that he is familiar with the clam known as a hard-shell little neck clam which belongs to the family usually known as the Venus clam; that he is also familiar with the soft-shell clam found in New England, having dug or dredged for them in the waters of Puget Sound where they are also present; that, for at least

10 years, he has been familiar with the baby clams imported from Japan, having seen them at the university, as a canned clam and having eaten them as canned clams; that the baby clams are now abundently growing in Puget Sound; that, in his experience, there is only one type of clam known as a baby clam which comes from Japan; that the baby and the little neck clam or any hard-shell clam fall within the family of the Venus clam.

Mr. Young then compared the meat of the baby clam from Japan with that of the soft-shell clam from New England and testified "Well, they are similar to some extent because they are both clams, but they are quite different visually"; that the biggest difference would be the proportion of the size of the neck to the body; that the soft-shell clam of New England has a larger neck in proportion to the body and is long and narrow and not as fat as the meat of the baby clam from Japan, which is round and more plump; that the meats of both are very similar, but the meat of the soft-shell clam is tougher, and the neck is usually clipped off the soft-shell New England clam and is not eaten; that the meats of the baby clam and the hard-shell little neck clams are very similar, both being round or rounder than they are long and having a neck quite small in proportion to the body; and they are both more tender than the soft-shell clam.

On cross-examination, Mr. Young testified that he has never been to Japan, but that he has seen baby clams from Japan which are small Venus clams or hard-shell clams; that this is readily established by looking at the meat; that the little neck clam canned at Port Townsend, Wash., is "possibly" identical with the clam from Japan.

In addition to the foregoing, there was considerable testimony relating to the shells of the various types of clams under discussion, i.e., baby clam shells, little neck clam shells, and the shells of soft-shell clams. There was no shell of the baby clam from Japan offered in evidence although there was offered and received in evidence as collective illustrative exhibits 1 through 3, respectively, shells of a baby clam grown in the United States, a soft-shell clam shell from New England, and a little neck clam shell grown in the United States.

It is appellant's contention herein that the appraiser erred in selecting the New England canned clam as the article which formed the basis of the return of value of the merchandise at bar under the provisions for American selling price. This is predicated upon the theory that the hard-shell little neck clam, packed by Iwerson Canning Co. of Bellingham, Wash., was more like or similar than the New England canned soft-shell clam. It is, therefore, urged that the appraiser should have found a value based upon the American selling price of the little neck clam packed by Iwerson Canning Co.

Based upon the stipulation relating to the basis of appraisement, it must be presumed that the New England soft-shell clam was like or similar to the imported merchandise. The parties did not stipulate whether the basis was "like" or "similar" merchandise. There have been numerous cases which have heretofore defined or laid down rules to assist in determining the meaning of the terms "like or similar."

In the case of *Japan Import Co.* v. *United States*, 24 C.C.P.A. (Customs) 167, T.D. 48642, the court, in considering the American selling price of certain canvas-topped rubber-soled shoes, made the following statements and gave the following definitions of the terms "like or similar":

\* \* \* The word "like" has been defined by us in *American Foundation (Inc.)* v. *United States*, 19 C.C.P.A. (Customs) 36, T.D. 44872, by the adoption of the definition of the word, as taken from Webster's New International Dictionary, 1925, as follows:

Having the same, or nearly the same, appearance, qualities, or characteristics; similar.

\*        \*        \*        \*        \*        \*        \*

The word "similar" has had frequent attention on the part of this court. We first gave it extended attention in *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T.D. 42714. The words involved in the statute there in issue were "such" or "similar." We reiterated our former conclusion that the word "such" meant "identical," and as to the word "similar," referred to the definition given in Webster's New International Dictionary (1925), as follows:

*Similar.* a.1. Nearly corresponding; resembling in many respects; somewhat like; bearing a general likeness.

While from the foregoing definitions, it is apparent that the terms "like or similar" do not require identity of merchandise, nevertheless, there is a distinction between the two. In the case of *Hoyt, Shepston & Sciaroni* v. *United States*, 38 Cust. Ct. 741, A.R.D. 74, it was held that if like merchandise exists, it must prevail over similar merchandise. If, therefore, we assume that the appraisement rests upon the existence of similar clams, but there were, in fact, like clams, the value of like clams must take precedence.

It was the trial court's theory that so long as the merchandise in issue was "like or similar" to a domestic clam, the basis of appraisement should be sustained. With this general proposition, we are in agreement. However, the court further held that if the importer has failed to establish dissimilarity between the imported clam and the domestic clam selected by the appraiser, then the appraisement must stand. With this extension of the principle, we are constrained to entertain a different view. The testimony establishes that the meat of the hard-shell and soft-shell clam is "very similar," and it does not appear to be contended that the imported clam and the soft-shell clam used as a basis for valuation by the appraiser are dissimilar.

It is our opinion that, under the authority of *Hoyt, Shepston & Sciaroni, supra*, the importer's position is tenable, if it establishes that like clams exist and are offered for sale under circumstances which would satisfy the definitions of American selling price.

The evidence establishes the imported baby clam to be a variety of the Venus clam, which is a hard-shell clam. The little neck clam packed by the Iwerson Canning Co. is also a hard-shell clam belonging to the Venus species, whereas the clam used as a basis for appraisement was stipulated to be a soft-shell clam. While it is true that no shells of the Japanese clams imported were introduced in evidence, the testimony of Mr. Young, a marine embryologist, establishes that, in addition to identifying clams by the shells, the shape of the meat, round as against elongated, the neck being small in proportion to the body as differentiated from a large neck, and the tenderness or toughness of the meat are also recognized methods of determining the type of clam from which it came.

We are of the opinion that the clam packed by Iwerson Canning Co., the hard-shell little neck clam, appears to more properly fall within the purview of the definition of "like," while the soft-shell clam used as a basis of appraisement is merely "similar."

Based upon the foregoing, we find as matters of fact:

1. That the merchandise in question consists of baby clams, packed in 10-ounce cans, exported from Japan between November 1953, through June 1954.

2. That such clams were appraised on the basis of the American selling price of canned soft-shell clams, packed and sold in the United States, at a value of $4.75 per dozen cans, less 1½ per centum cash discount, less one-quarter of 1 per centum swell allowance, except for entry 6980, covered by reappraisement No. 246711-A, which was given a swell allowance of one-tenth of 1 per centum.

3. That, during the period in question, Iwerson Canning Co. of Bellingham, Wash., was canning and freely offering and selling in the United States a 10-ounce can of hard-shell little neck clams "like" the imported clam at a price of $7.50 per 2 dozen cans, less 1½ per centum cash discount, less one-tenth of 1 per centum swell allowance, net, packed.

4. That the soft-shell New England clams used as a basis for valuation of the American selling price by the appraiser was "similar" to the imported clam.

We find as conclusions of law:

1. That, on or about the dates of exportation herein, the proper basis of appraisement of the imported clams involved herein is the American selling price, as defined in section 402(g) of the Tariff Act of 1930, as amended.

2. That the proper American selling price for the imported clams is that set forth in finding of fact No. 3.

The decision and judgment of the trial court are, accordingly, reversed. Judgment will be rendered accordingly.